EARL, Ch. J., reads for reversal and new trial.

FINCH, PECKHAM and MAYNARD, JJ., concur; ANDREWS, GRAY and O'BRIEN, JJ., dissent.

Judgment reversed.

---

MARIA MOELLER, as Administratrix, etc., Respondent, *v.* H. AUSTIN BREWSTER et al., Appellants.

In an action to recover damages for alleged negligence causing the death of M., plaintiff's intestate, the following facts appeared: M. was employed by defendants, who were engaged in manufacturing steam heating apparatus in their factory, one of his duties being to test the radiators to see if they were steam tight. This was done by attaching the radiator or sections of it to a pipe connected with a steam boiler. One of them exploded while M. was hammering upon it, the steam not having been turned off, and he received injuries resulting in his death. He had been repeatedly warned of the danger and forbidden to hammer upon the radiators when steam was on. *Held*, that M. was guilty of contributory negligence, and plaintiff was not entitled to recover.

(Argued February 2, 1892; decided March 1, 1892.)

APPEAL from judgment of the General Term of the Supreme Court in the fifth judicial department, entered upon an order made the first Tuesday of October, 1891, which affirmed a judgment in favor of plaintiff and affirmed an order denying a motion for a new trial.

This was an action to recover damages for the death of John Moeller, plaintiff's intestate, which was alleged to have been caused through the negligence of defendants, who are manufacturers of steam heating apparatus. The works had been conducted for about fifteen years by a mechanical engineer, when defendants bought them. They continued said engineer in their employ and also said intestate, who was not a mechanic, but had been employed about the works seven or eight years as a general utility man. One part of the duties assigned to him and which he had performed during all the time he had been at work there, was that of testing the steam radiators to ascertain whether they were steam tight. This testing was done by attaching a radiator, or sections of it, to a pipe connected with a steam boiler in the basement and allowing the

steam to fill the radiator, and if there were any holes or imperfections in the radiator they would be discovered by the escape of the steam.   If the holes were of a considerable size it was the duty of the tester to turn off the steam and plug the holes, or stop them by other means; if small, the process of stopping them was by tapping with a hammer and sometimes also employing a punch.

Defendants received an order for a lot of circular radiators, which were somewhat different from those that had been manufactured at the works.   While M. was engaged in testing the third one of these radiators, the steam being turned on, with the assistance of his helper and the manager, it was turned over and exploded, and the manager rebuked him for testing or turning it while the pressure was on.   Three more were tested without accident, and while hammering upon the seventh one for the purpose of testing it, while the pressure was on, it exploded, and M. received injuries from which he died.   M. had been particularly and frequently warned by the manager not to hammer on the radiator when the steam was on.

Further facts are stated in the opinion which is given in full.

" There is in this case not only an absence of any proof indicating that the intestate was free from negligence which contributed to the injury, but conclusive and uncontradicted evidence to the contrary.

" Assuming, although it is hardly possible to say it, that there was some evidence extremely weak and inconclusive, that the new bases of the circular radiators were not as strong to resist the usual steam pressure as they should have been, and that this was a negligent omission instead of an error of judgment consistent with reasonable care, it is yet certain that pounding with a hammer upon the radiators when under the steam pressure was a dangerous and perilous act; that the intestate was repeatedly warned of the risk and requested to desist; that one of the same bases had exploded under the jar of turning it over the day before, and that in spite of that experience and the repeated warnings, he continued to hammer the iron till the moment of the explosion.   The proof is wholly without contradiction that such treatment of iron

under steam pressure tends to weaken it and increase the peril of an explosion, and the risk of that · hammering the intestate took after one explosion had already occurred, when he knew by observation, and had been repeatedly told, that the bases were different from thosé which he had been in the habit of testing, and that there was need of care.

" Two answers are made to this proof. It is said that Widdowson, the foreman who testified to the warnings, was impeached by showing that his evidence differed from that given on a former trial; but he was corroborated by Lewis, who told deceased to point the gun the other way; by Glasser, who warned him that if he hammered on the base in that way it would be liable to explode; by Mr. Lyon, the foreman, who told him explicitly that he 'should not hammer the bases with the steam on, or he would get blown up, and he must not do it,' and to some extent by James Blackwood. There was no evidence to the contrary, and not the least rea- son to doubt the fact of these orders and warnings. The jury had no right, upon some imaginary theory, to totally disregard the proof.

" But it is said the evidence showed that pounding under pressure was necessary. It failed entirely to go to that extent. It did show that the presence and pressure of the steam was essential to discover minute defects in the iron, but it showed, also, that no pounding was necessary to the discovery; that the locality could be marked with chalk or with a tool, and then with the steam turned off the 'peening' could be done and the minute opening closed with the hammer or the punch. It was, perhaps, not quite so convenient a way, and took more time, but was entirely possible and avoided the very act which contributed to the explosion. The principal witnesses for the plaintiff admitted that there was no dispute about it. The learned counsel for the plaintiff, claiming that there was proof of such necessity, makes three references to the testimony. The first is to the evidence of Mr. Light, where he said: 'In most of the castings it was the custom during the time that I was there to peen these small holes while the steam was on.' But the custom was one thing and the necessity another, and the same witness had previously said: 'It can also be done by

removing the steam or water and peening, and then let it on again.' The next reference is to the remark of the same witness : 'Most of the peening was on light casting, and it was done with the pressure on and sometimes shut off.' The third reference is to the cross-examination of Widdowson, where he said : 'If the leaks were very small you could tap them with the hammer and stop them in that way with the steam on ; you can't tell exactly where they are if there is no steam in there to tell.' That is true, of course. It is the steam which shows the leak, and that being marked, the steam can be shut off and the peening done. The same witness had just before said : 'It was the constant practice with him to peen the small holes with the steam on ; that was what called my attention to stop his doing it.' Those are the respondent's references, and they raise no issue of a supposed necessity, and the direct proof is to the contrary. It is absurd to suppose that four skilled workmen would have told him not to peen with the steam on if it could be done in no other way ; and that he should have assented to the direction, saying it was all right, instead of protesting against an order which made his work impossible.

"So that neither answer to the evidence of contributory negligence has any foundation in the facts of the case, and it stands in the proof established and undisputed. Unless we abandon the rule wholly, and allow the sympathy of a jury to override the evidence and the law, we must say in this case that the plaintiff failed to show a right of recovery.

"The judgment should be reversed and a new trial granted, costs to abide the event."

*Walter S. Hubbell* for appellant.

*Eugene Van Voorhis* for respondent.

Finch, J., reads for reversal and new trial.
All concur.
Judgment reversed.